**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

JILL SNYDER,

          Plaintiff,

vs.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

          Defendant.

No. 16-CV-2101-LRR

**REPORT AND RECOMMENDATION**

## I.    *INTRODUCTION*

The plaintiff, Jill L. Snyder (claimant), seeks judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying claimant's application for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. § 401 *et seq.* For the reasons that follow, I recommend the District Court affirm the Commissioner's decision.

## II.    *BACKGROUND*

Claimant is a 56-year-old woman and was 52 years old at the time of the filing of her application for disability benefits on June 23, 2013. (AR 160). Claimant's alleged disability onset date was November 13, 2009. (AR 160). Claimant met the qualifications for insured status through March 31, 2015. (AR 181). The Commissioner denied claimant's application initially and upon reconsideration. (AR 103-06, 108-11). The ALJ held a video hearing on February 3, 2015. (AR 34). The ALJ issued her decision finding claimant not disabled on March 27, 2015. (AR 26). The appeals council denied

review of the ALJ's finding of not disabled on June 22, 2016, and the ALJ's decision became the final decision of the Commissioner. (AR 1).

On August 22, 2016, claimant filed a complaint in this Court. (Doc. 1). On March 2, 2017, claimant filed her brief (Doc. 11), and on March 30, 2017, the Commissioner filed her brief. (Doc. 14). On April 10, 2017, claimant also filed a reply brief. (Doc. 15). On April 11, 2017, the Court deemed this case ready for a decision and the Honorable Linda R. Reade, United States District Court Judge, referred this case to me for a Report and Recommendation. (Doc. 13).

### III.   SUMMARY OF RELEVANT FACTS FROM THE RECORD

A state agency consultant, Stephen Elliot, Ph.D., reviewed claimant's application for disability at the initial level. (AR 86). At the initial level a consultative examination (CE) was requested and psychologist Dr. Scott prepared a report pursuant to that CE. (AR 80). Dr. Elliot found that the claimant had the following severe medically determinable impairments: gastritis and duodenitis, anxiety disorders, and somatoform disorders. (AR 78). Dr. Elliot found that these medically determinable disorders could cause the claimant's pain and other symptoms, but that the claimant's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not supported by the objective medical evidence. (AR 79).

Dr. Elliot found that claimant's statements about her physical limitations were not supported by her statements of her daily activities being significantly limited, but her statements about her mental limitations were consistent with the medical record. (AR 80). Dr. Elliott determined that claimant's history of osteoporosis was well documented and that she had wedge deformities at several places in her spine and was recommended therapy and Reclast.[1] (AR 82). Dr. Elliott noted that at her GI exam in 2013, the doctor

---

[1] Reclast is a medication indicated for treatment of osteoporosis in postmenopausal women.

noted "[n]o edema, muscle mass is preserved, muscle strength is also preserved, and gait examined and was normal." (AR 83). Dr. Elliot then noted claimant's GI issues and noted that claimant's diarrhea had turned to constipation and that she had had less problems with vomiting and that claimant followed a special diet for her gastrointestinal issues. (AR 82). Dr. Elliott also noted that she had gained weight in 2012 and at her last visits, "was described as stable and is doing well." (AR 82). Dr. Elliott found little objective medical evidence to support the claims of hyperparathyroidism, chronic migraines, PRIM or aldosteronism.[2] (AR 82). Dr. Elliott found that many of her diagnoses were supported by objective medical evidence, but that claimant's osteoporosis would not cause the pain described by claimant. (AR 82). Dr. Elliott also determined that claimant's reports of her limitations were undercut by her described daily activities of cooking, shopping, driving, walking, and caring for her grandchildren as well as third party reports. (AR 82).

David Christiansen, Ph.D., performed a mental RFC evaluation at the initial level. (AR 84). He found claimant did have memory limitations such that claimant's ability to understand and remember detailed instructions would be moderately limited as well as sustained concentration limitations which would also limit her ability to carry out detailed instructions and maintain attention. (AR 83). Dr. Christiansen also noted that claimant's ability to complete a normal workday and workweek without interruptions from psychologically base symptoms and perform at a consistent pace without an unreasonable number and length of rest periods would be moderately limited. (AR 83). Dr. Christiansen found that claimant's reported limitations were consistent with the file and that claimant's ability to carry out instructions, maintain attention, concentration, pace and ability to remember and understand instructions were fair to good. (AR 84).

---

[2] Aldosteronism is the excess production of the hormone aldosterone by the adrenal glands.

Additionally, Dr. Christiansen stated that claimant was able to interact appropriately with supervisors and would be capable of doing simple and routine work-like activities. (AR 84).

On reconsideration, the claimant was found to have the medically determinable impairments of gastritis and duodenitis, anxiety disorder, and somatoform disorders. (AR 94). Dr. Laura Griffith, D.O., considered the new evidence of a worsening condition submitted by the claimant including that she had experienced severe diarrhea and constipation due to her gastroparesis, which caused bloating and weight gain which increased her chances of having another bone fracture and that because of her osteoporosis she was limited to lifting only five pounds. (AR 98). Dr. Griffith determined that this additional information did not significantly change the prior record and that the prior determination was consistent with the record. (AR 98). Myrna Tashner, Ed.D., evaluated claimant's file upon reconsideration and found that claimant's additional alleged memory loss did not change the prior mental RFC determination. (AR 100).

Dr. Victor Mujica, M.D., treated claimant in 2012 at the Covenant Clinic in Waterloo, Iowa. (AR 274). Dr. Mujica provided a second opinion for claimant's GI issues due to her dissatisfaction with prior treatment for gastroparesis in September of 2012, and reported that she reported inability to tolerate a regular meal, nausea, vomiting and unexpected weight change, but no major abdominal pain. (AR 282 & 286). In August of 2012, Dr. Mujica noted that claimant had normal range of motion, though claimant reported nausea, vomiting, abdominal pain, and constipation. (AR 303). At the same visit Dr. Mujica noted that she was well oriented and had normal mood and affect, her thought content was normal, though she did report anxiety. (AR 282). In November of 2012, claimant again saw Dr. Mujica, where he stated, "[claimant] has been following a puree diet as recommended with excellent tolerance. She has gained

some weight. She feel [sic] overall improved. She denies any major episode of nausea, vomiting or abdominal pain." (AR 284).

In November of 2012, claimant was seen at the Cedar Valley Bone Health Institute to discuss treatment options for her osteoporosis. (AR 292). At that visit it was documented that she had lost 2.25 inches in height. (AR 292). Claimant was diagnosed with severe osteoporosis and the report indicated vertebral fracture deformities in the spine. (AR 298). Claimant was assessed to have a 23% risk of major osteoporotic fracture and 11% risk of hip fracture in the next 10 years. (AR 313).

On the first of January, 2013, claimant was seen by Dr. Ravindra Mallavarapu, M.D., at the Allen Memorial Hospital for upset stomach and nausea, with reported back pain. (AR 334). At this visit she was noted as having a full range of motion with no edema, or joint deformity. (AR 335).

Claimant saw Dr. Matthew Kettman, M.D., regularly and he was her primary treating physician. On October 9, 2012, he saw claimant and she reported that she had back and neck pain due to a fall, for a follow-up for her migraine headaches, a follow-up for her GI issues, and she also reported problems with insomnia and depression. (AR 444). At a follow-up visit to her hospital visit in January 2013, with Dr. Kettman, claimant reported continuing abdominal pain and diarrhea and racing thought, inability to sleep, anxiety, and depression. (AR 346). But claimant also reported "feel[ing] better." (*Id.*). Dr. Kettman noted that more than 50% of the 25-minute visit had been discussing claimant's depression. (AR 348). At a visit to Dr. Kettman in February, 2013, Dr. Kettman noted that claimant was bipolar and her condition was unstable, but noted that she was doing well and did not "have any current symptoms associated with the condition or current treatment regimen." (AR 352). He also noted the claimant had normal affect with no obvious cognitive defects in memory or recognition during speech. (AR 354). Three weeks later on February 28, 2013, claimant visited Dr. Kettman for a

follow-up for her depression and reported that she felt more emotional and her mood was not better and felt her condition had been worsening since beginning the new medication. (AR 355). In June of 2013, claimant reported that she was doing well and had no active complaints. (AR 362). At the same appointment claimant reported no nausea, good intake, no vomiting, no abdominal pain, no diarrhea and no constipation. (AR 363).

On June 4, 2013, claimant visited Dr. Kettman complaining of constipation despite taking her medications. (AR 426). Claimant had an appointment with Dr. Tarek Daoud, M.D., on June 18, 2013, for a follow-up where she stated she was doing well and had no active complaints. (AR 451).

On August 29, 2013, claimant visited the Mayo Clinic and during her appointment Dr. Robert Kraichely, M.D., noted that claimant had been following a gastroparesis diet and that she had "done reasonably well with this," and she was not experiencing vomiting. (AR 517). However, Dr. Kraichely went on to state that after "requiring vancomycin due to contracting C. diff colitis" she had had trouble with her bowels. (AR 517). He went on to state:

> She really tends towards significant constipation, sometimes going over a week without a bowel movement. This is in spite of having fairly good oral intake. She has required laxatives, typically stimulants . . .. These [claimant's prescription medication to regulate bowel movements] do not seem to help. She will have liquid bowel movements, but it is very difficult to initiate a bowel movement . . . and has required some significantly increased time on the commode to have bowel movements. The unpredictability of the effects of the laxatives has kept her pretty much in the house for much of the last several months.

(AR 517).

In July of 2013, claimant's friend Ms. Deike, completed a function report for claimant. (AR 180). She stated that at that time claimant cared for her grandchildren on

a regular basis, did not need reminders to take care of personal grooming, was able to prepare her own meals, do light cleaning, and light loads of laundry. (AR 174-75). Ms. Deike also indicated that the claimant drove and went to the grocery store by herself weekly. (AR 176)[3]. Ms. Deike stated that claimant had no problem handling money. (*Id.*). Ms. Deike stated that claimant had a limited ability to ingest regular foods, had difficulty concentrating, and memory problems due to her migraines. (AR 175-77). Claimant reportedly socialized on a weekly basis with friends, her daughters, and left her home to go to church and the grocery store. (AR 177). Claimant's socialization had been hindered by her illness as she did not feel well enough to socialize and her bipolar disorder would hinder her because she would have mood swings and become irritated easily making it difficult for her to interact with others. (AR 178 & 180). Ms. Deike also reported limitations regarding claimant's ability to perform many tasks, such as lifting, squatting, bending, standing, walking, kneeling, climbing stairs, her memory, task completion, concentration and ability to get along with others. (AR 178). Ms. Deike reported claimant could walk five or six blocks continuously without requiring a break. (AR 178).[4]

In the fall of 2013, claimant visited the Mayo Clinic for osteoporosis and for constipation (AR 548 & 523), saw Dr. Daoud for routine follow-ups (AR 552 & 575), and was examined by state consultant Dr. Scott (whose findings are discussed at length in the *Section VII. A.*). In February of 2014, claimant's potassium levels were stable. (AR 624). In December of 2014, claimant saw Dr. Kettman, who reported that despite

---

[3] I note that this contradicts claimant's personal testimony at the hearing before the ALJ, where claimant testified that she only goes grocery shopping with her best friend, who then carries the groceries for her. (AR 60).

[4] Claimant testified she could walk one block before her hips hurt. (AR 56-57).

claimant reporting that she had severe symptoms, she was "[t]aking nothing as medication" (AR 666) and visited the Mayo Clinic for her osteoporosis (AR 600-01).

In February of 2015, at the hearing before the ALJ, claimant testified to the following: She suffers from past sexual abuse. (AR 51). Claimant testified that she could only walk one block before her hips hurt. (AR 56-57). She testified that she could not crawl, kneel, use ladders, bend over without pain, or twist. (AR 57). Claimant also testified that she did not handle stress well as it triggered her bipolar moods, which in difficult social situations caused her to be "upset" or "fly[ ] off the handle." (AR 53). She stated that her anxiety caused her to "excessively worry" and gave her "lots of sleepless nights." (*Id.*). She stated that she could not concentrate for more than five minutes. She testified that she drove three times a week, and if she drove for longer than 12 minutes, then she needed frequent stops due to pain. (AR 58). She stated that she could not babysit her grandchildren anymore, and the last time she did was the past summer and she ended up "hurting too much." (AR 59). Claimant also stated that she washed dishes but with breaks, did her own laundry, went grocery shopping with a best friend who carried the groceries for her, and sometimes attended church. (AR 60-62).

## IV. DISABILITY DETERMINTATIONS AND THE BURDEN OF PROOF

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual has a disability when, due to his physical or mental impairments, he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). If the claimant is able to

do work which exists in the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic conditions, employer hiring practices, or other factors, the ALJ will still find the claimant not disabled.

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. "Substantial" work activity involves physical or mental activities. "Gainful" activity is work done for pay or profit, even if the claimant did not ultimately receive pay or profit.

Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner looks to the severity of the claimant's physical and mental impairments. If the impairments are not severe, then the claimant is not disabled. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to perform basic work activities. *Kirby*, 500 F.3d at 707.

The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); 20 C.F.R. § 404.1521(b)).

Third, if the claimant has a severe impairment, then the Commissioner will determine the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

considered disabled regardless of age, education, and work experience. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of his past relevant work. If the claimant can still do his past relevant work, then he is considered not disabled. Past relevant work is any work the claimant performed within the past fifteen years of his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (citations and internal quotation marks omitted). The RFC is based on all relevant medical and other evidence. The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Id.* If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. The Commissioner must show not only that the claimant's RFC will allow him or her to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). If the claimant can make the adjustment, then the Commissioner will find the claimant not disabled. At Step Five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination

about the existence of a disability. The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

If after these five steps, the ALJ has determined the claimant is disabled, but there is medical evidence of substance use disorders, the ALJ must decide if that substance use was a contributing factor material to the determination of disability. 42 U.S.C. §423(d)(2)(C). The ALJ must then evaluate the extent of the claimant's limitations without the substance use. *Id.* If the limitations would not be disabling, then the disorder is a contributing factor material to determining disability, and the claimant is not disabled.

## V.      THE ALJ'S FINDINGS

At Step One, the ALJ found claimant had not engaged in substantial gainful activity since November 13, 2009, the alleged disability onset date. (AR 14).

At Step Two, the ALJ found claimant had the severe impairments of osteoporosis, gastroparesis, a history of Reynaud's phenomenon, anxiety disorder with posttraumatic stress disorder (PTSD), and bipolar disorder. (AR 14). The ALJ found that claimant had the non-severe impairments of migraine headaches and hypokalemia. (AR 14-15).

At Step Three, the ALJ found claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

At Step Four, the ALJ found claimant had the residual functional capacity to perform light work, with a limitation to carrying 20 pounds occasionally and 10 pounds frequently. The ALJ also found that she could stand or walk for six hours total of an eight-hour workday, and she could sit for up to six hours of an eight hour workday. The claimant could also climb, balance, stoop, kneel, crouch or crawl occasionally and could only have occasional exposure to extremes of heat or cold and should have no exposure to hazardous conditions such as working around heights or moving machinery.

Additionally, the ALJ found she could not climb ropes, ladders or scaffolds. Lastly, the ALJ found claimant could only perform tasks learned in 30 days or less, involving no more than simple work-related decisions requiring little to no judgment, with only occasional workplace changes. The ALJ also determined claimant could not perform any past relevant work as a dialysis technician. (AR 17, 185).

At Step Five, the ALJ found that given claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. Based on the testimony of the vocational expert, the ALJ determined claimant could perform the jobs of office helper, pricer, or folder. (AR 25).

## VI. THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ..").  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations and internal quotation marks omitted).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but we do not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The court considers both evidence which supports the Commissioner's decision and

evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) (citation omitted) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## VII. DISCUSSION

Claimant alleges the ALJ erred in three ways:

1. The ALJ did not properly evaluate or incorporate the work-related limitations from Dr. Scott into claimant's RFC assessment.

2. The ALJ did not properly incorporate the work-related limitations of claimant's treating physician Dr. Kettman, into her RFC assessment.

3. The ALJ's RFC is not supported by substantial evidence on the record.

### A. Dr. Scott

Claimant argues the ALJ gave too great a weight to the opinion of Dr. Scott in determining claimant's RFC. Again, Dr. Scott conducted a CE of claimant on September 23, 2013. My understanding of claimant's argument is that the ALJ should not have accorded significant weight to the opinion of Dr. Scott, because his opinion about claimant's functional capacity was premised on the claimant's receipt of accommodations for her disabilities. (Doc. 11 at 17-18). Or alternatively, the ALJ should have subtracted any mention of accommodation from Dr. Scott's opinion and incorporated these more severe limitations into the RFC. The Commissioner responds that the ALJ was allowed to give the word "accommodation" in Dr. Scott's report the common everyday meaning of the word rather than its more specific and technical use under the Americans with Disabilities Act (ADA). (Doc. 14, at 13). Further, the Commissioner argues that the ALJ appropriately took into consideration Dr. Scott's opinion of claimant's need for accommodations. (Doc. 14, at 13-14).

The parties are in agreement that the SSA's disability determination does not take into account the "ADA-style accommodations" that an employer may be willing to make that would allow a claimant to perform that job. (Doc. 14, at 13). Claimant relies on *Eback v. Chater*, 94 F.3d 410 (8th Cir. 1996), in arguing that the ALJ's accord of "significant weight" to the opinion of Dr. Scott was inappropriate given his statements

about "accommodations." In *Eback*, the Eighth Circuit Court of Appeals found it improper for an ALJ to rely on a vocational expert's opinion that employers would make ADA accommodations for the claimant and with those accommodations Eback could perform other work. *Eback*, 94 F.3d at 412. In *Eback*, the vocational expert premised his opinion of the ability of claimant to perform other work on the belief that employers would provide accommodations to claimant under the ADA, where without the accommodation the other work would be outside of Eback's RFC. *Id.*; *see also Sullivan v. Halter*, 135 F. Supp. 2d 985, 987-88 (S.D. Iowa 2001) (finding error where vocational expert testified that claimant could do other work if, as the vocational expert believed she would, claimant received a specific work accommodation. "Whether or how an employer might be willing, or required, to alter job duties to suit the limitations of a specific individual is not relevant because Social Security's "assessment must be based on broad vocational patterns . . . rather than on any individual employer's practices.").

*Eback* is distinguishable, however, from the case before the Court. Here, the reference to "accommodations" by Dr. Scott in his opinion incorporated his belief that due to claimant's limitations she would be limited in the environments in which she could work and may require "accommodations" for her mental abilities. (AR 530-31). Additionally, in this case, unlike *Eback*, the ALJ weighed this medical opinion evidence into her overall RFC assessment which was then correctly presented to the vocational expert who testified based on the RFC alone, without assumptions of whether claimant would receive any ADA accommodation, that claimant could perform other work. The vocational expert's determination that claimant could perform other work was not contingent on the assumed receipt of accommodations like that in *Eback* and *Halter*.

Dr. Scott opined:

> [T]his examiner believes that [claimant] would probably succeed in a competitive work setting wherein accommodations are made for medical issues as well as emotional reactivity and memory deficits under stress. Following are estimates of Jill's mental abilities in work-related activities: Remember and understand instructions, procedures, and locations, fair to good with accommodations; Carry out instructions and maintain attention, concentration, and pace, fair with accommodations; Interact appropriately with supervisors, good but with coworkers and the general public, marginally fair with accommodations; Use good judgment and respond appropriately to changes in the workplace, fair only with accommodations focusing on stress reduction and limited work ambiguities.

(AR 530-31). I find the ALJ properly gave Dr. Scott's opinion "significant weight." First, the ALJ weighed Dr. Scott's opinion as "from an examining, non-treating medical source." (AR 22). Serving as the consultative examiner, Dr. Scott was qualified as a licensed psychologist. 20 C.F.R. § 404.1513 (acceptable medical source); 20 C.F.R. § 404.1527 (weighing opinions). Second, the claimant alleges that Dr. Scott's opinion is flawed due to the uncertainty of whether he meant ADA-style accommodations or even accommodations as used in an everyday meaning. (Docs. 1 & 15) (using Merriam Webster Dictionary definition of accommodation for its everyday meaning). Claimant's main contention is that the need for accommodations "reflects an inability to perform competitive employment" inapposite to the ALJ's denial of disability and giving Dr. Scott significant weight. Again, both parties agree that in a disability determination by the SSA there is no consideration of ADA accommodations. Nonetheless, despite however Dr. Scott intended the use of the word "accommodations," I agree with the Commissioner that the ALJ is free to give terms their everyday meaning in reviewing the evidence. *See Julin v. Colvin*, 826 F.3d 1082 (8th Cir. 2016) ("The ALJ's use of the term 'occasional' . . . there is no indication that the ALJ or the vocational expert understood the term to

carry more than its everyday meaning. Social Security Ruling 96-6p . . . cited by Julin, involves a specialized meaning of 'occasionally' in the context of sedentary work.").

Regardless of how Dr. Scott intended the use of the word "accommodations," his opinion was entitled to significant weight because, as the ALJ points out, it was generally consistent with the treatment notes on record as well as with the state agency consultants who gave Dr. Scott's report great weight. Despite claimant's severe mental impairments of anxiety disorder with PTSD and bipolar disorder, the record reveals essentially ordinary mental status findings and minimal mental health treatment. The RFC incorporates mental limitations of performing tasks learned in 30 days or less, simple work-related decision-making with little/no judgment, and occasional workplace change.

The ALJ's RFC assessment therefore incorporated most of Dr. Scott's opined limitations, which is appropriate given the significant weight designation. Treatment notes that reflect essentially normal mental status findings include: AR 336 (7/10/12, claimant is alert and oriented); AR 303 (8/31/12, normal mood/affect, normal thought content, oriented); AR 282 (9/30/12, oriented to person, place, time and alert, normal thought content, and normal mood/affect); AR 284 (11/2/12, same); AR 286 (11/4/12, same); AR 335 (12/31/12, affect normal, alert, oriented), AR 346-47 (1/17/13, despite being anxious, claimant has "no mental health changes" and possesses appropriate affect, intact judgment and insight); AR 353 (2/7/13, same); AR 365 (5/20/13, "appropriate [psych], no evidence of depression, anxiety, agitation"); AR 424 (6/27/13, "appearance no acute distress . . . no mental status changes"); AR 545 (10/7/13, "No anxiety; no depression; no mania; no delusion; no hallucinations"); AR 619 (9/25/14, mental "appropriate; no evidence of depression, anxiety or agitation"); and AR 601 (12/17/14, "Mental: Examined and normal"). *See* AR 78-86 and AR 95-102 (state consultants relying on Dr. Scott's opinion).

Furthermore, the Commissioner accurately states that an ALJ is not required to "explicitly accept or reject functional limitations on a line-by-line basis." (Doc. 14, at 14 (citing *Depover v. Barnhart*, 349 F.3d 563, 567-68 (8th Cir. 2003) and *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). It is the ALJ's role to assess the medical evidence and resolve any inconsistencies between it to craft an RFC assessment. The ALJ did not err in giving significant weight to Dr. Scott as his opinion was supported by substantial evidence nor is there any indication that the ALJ improperly relied on ADA-style accommodations to find claimant not disabled (unlike in *Ebeck*, there was no mention of accommodations in the hypothetical question posed to vocational expert here).

### B.    Dr. Kettman

Claimant argues that the ALJ did not properly evaluate the opinion of Dr. Kettman, claimant's treating source, as the ALJ should have given the opinion controlling weight in her determination of claimant's RFC. She claims statements in Dr. Kettman's medical source statement such that claimant would require a job that permitted ready access to a restroom and that she would need unscheduled rest breaks four times during an eight-hour work day, for at least 15 minutes, should have been afforded greater weight. Specifically, the vocational expert testified that competitive employment would be precluded if claimant required a 15-minute break every two hours outside of normal breaks and meal periods or, in the alternative, required absences of four days per month or more. (AR 69-71).

Dr. Kettman, a family practice physician, had treated claimant for "every three months for three years." (Doc. 10). As summarized in the joint statement of facts, Dr. Kettman wrote in the medical source statement as follows:

> [Claimant] needed a job that permitted ready access to a restroom. [Claimant] needed unscheduled restroom breaks at least 6 times during an eight hour workday. She needed unscheduled rest breaks four times during an 8 hour work day, for at least 15 minutes. [Claimant] was to never lift

ten pounds. (TR 595). [Claimant] was able to use her hands to grasp, turn or twist objects; her fingers for manipulation; and to reach for 10% of an 8 hour work day. [Claimant] would be off task 25% or more during a typical workday due to her symptoms. She was incapable of even low stress work due to her bipolar disorder. [Claimant]'s impairments produced [all] bad days. Dr. Kettman anticipated [claimant] would be absent from work more than four days a month due to her impairments or treatment. [Claimant] would have environmental limitations of dust due to her asthma and cold due to her Raynaud's.

Doc. 10, at 17. Overall, Dr. Kettman opined a "poor" prognosis for claimant. (AR 592).

Essentially claimant asks the court to re-weigh the evidence on the record to find that the limitations opined by Dr. Kettman in the medical statement were supported by substantial evidence. In her brief, claimant thoroughly highlights evidence regarding her gastrointestinal issues and related sleeping problems and pain as well as osteoporosis. (Doc. 11, at 7-14). On the other hand, the Commissioner contends that the ALJ was proper in assigning Dr. Kettman's opinion no probative values as it is inconsistent with his own treatment notes and other treatment notes on the record.

Generally, it is for an ALJ to determine the weight to be afforded to the opinions of medical professionals, and "to resolve disagreements among physicians." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). An ALJ is required to give "controlling weight" to a treating-source's medical opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2). *See also Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (holding that an ALJ must give "substantial weight" to a treating physician, but may discount that weight if the opinion is inconsistent with other medical evidence). An ALJ is not, however, required to explicitly discuss every factor in 20 C.F.R. § 404.1527. *See Molnar v. Colvin*, No. 4:12-CV-1228-SPM, 2013 WL 3929645, at *2 (E.D. Mo. July 29, 2013)

("[A]lthough the ALJ did not explicitly discuss every factor of 20 C.F.R. § 404.1527(c) in evaluating the opinions of Plaintiff's treating sources, the ALJ was not required to do so.") (unpublished) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 n.3 (8th Cir. 1998) (the ALJ does not need to discuss every piece of evidence submitted, and the ALJ's failure to discuss specific evidence does not mean that it was not considered by the ALJ)).

Here the ALJ discounted Dr. Kettman's medical source statement as the "checklist-style form appears to have been completed as an accommodation to the claimant and, as noted above, includes information filled in by the claimant. [The ALJ found] this evidence has no probative value because it is not supported by any objective evidence." (AR 23). It was proper for the ALJ to assign Dr. Kettman's opinion no probative weight. First, the medical source statement was partially filled out by claimant. From my understanding of Dr. Kettman's handwriting, he twice remarks on the statement that the claimant responded or answered the questions. *See* AR 593 ("P[atien]t filled out this section" likely referring to the Mental Abilities and Aptitudes Needed to Do Unskilled Work/Semiskilled and Skilled Work/Particular Types of Jobs consisting of 25 questions); AR 596 (responding to the question to what degree can claimant tolerate work stress, the box for "incapable of 'low stress' work" was checked and Dr. Kettman's reason was: "Patient Response-Bipolar.").

Thus it appears, at least in part, that claimant filled out portions of the statement for Dr. Kettman and likely was present while he was completing the form to offer additional help. Claimant contends that her completion of the mental abilities checklist does not call into question the disabling physical limitations opined by Dr. Kettman. To the extent any of Dr. Kettman's physical limitations were influenced or answered by claimant, the ALJ properly discounted them. As the ALJ found claimant incredible—a finding claimant does not allege was in error—the ALJ was permitted to discount Dr. Kettman's opinions to the extent that it "relied" on her subjective complaints. *Julin*, 826 F.3d at 1089 ("Because the ALJ declined to credit Julin, the ALJ was entitled to discount Dr. Welsh's opinions insofar

as they relied on Julin's subjective complaints") (citing *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) and *Kirby*, 500 F.3d at 709).

Claimant also argues that the ALJ improperly took issue with the fact that Dr. Kettman completed the medical source statement as an accommodation to claimant. (Doc. 11, at 15 citing *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (ALJ cannot reject doctor's opinion merely because it was solicited by claimant or attorney)). The Commissioner essentially agrees. The Commissioner contends that the ALJ's comment referencing such an "accommodation" referred to her observation that claimant completed in part the medical source statement. I agree. Nonetheless, there is substantial evidence on the record that allowed the ALJ to give Dr. Kettman's opinion no controlling weight.

Second, the medical source statement consisted in part of checked boxes. The Eighth Circuit Court of Appeals has "recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (quoting *Wildman,* 596 F.3d at 964). The *Anderson* Court held that an ALJ did not err in discounting a treating medical sources' medical source statement relating to claimant's functional limitations, where the restrictions appeared nowhere else in the treatment notes, were inconsistent with those notes, were not supported by objective testing, and were not supported by the record as a whole. *See also Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (finding the ALJ "properly discounted the physician's medical source statement because the statement" stood alone and was not supported in treatment notes or corroborated by objective evidence). Furthermore, as noted above, a majority of these boxes were checked by claimant herself.

Third, the ALJ essentially noted that the medical source statement consisted in part of non-medical opinion. The Commissioner points out that to the extent that Dr. Kettman opined claimant was disabled or could not work, such was entitled to no deference. Determinations

of ability to work are solely within the discretion of the Commissioner. *See* SSR 96-5P, 1996 WL 374183, at *1-3 (July 2, 1996) ("treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance."); 20 C.F.R. § 404.1527(d). Presumably, the argument could be made that where Dr. Kettman (or the claimant, as she clearly gave the reason for the selection) checked the "incapable of even low-stress work" box to imply that essentially claimant could do no work at all. To the extent such an argument could be made, this is a non-medical opinion that infringes upon the Commissioner's discretion. While it must be considered, it deserves no special significance.

Fourth and last, Dr. Kettman's opinion in the medical source statement was inconsistent with his own treatment notes. The ALJ wrote that Dr. Kettman's opinion lacked support by any objective evidence. The Commissioner argues that such "objective" evidence refers to Dr. Kettman's own treatment notes and other treatment notes on the record. I find this to be a reasonable and logical conclusion. Upon my own review of the medical records, Dr. Kettman's opinion is inconsistent with the substantial evidence. In 2013, Dr. Kettman's treatment notes reflect a healthier claimant than he opined to in his medical source statement. *See* AR 346-48 (1/17/13, hospital follow-up, despite claimant having anxiety, some depression, sleep issues, she "feels better", good appetite, no fever, no night sweats, no mental status changes, no motor weakness, no sensory changes, appropriate affect, intact judgment and insight); AR 349 (1/24/13, well appearing, no acute distress, normal active bowel movements, good appetite, no mental status changes); and AR 352-54 (2/7/13, same).

I recognize that Dr. Kettman's treatment notes are from the beginning of 2013, while his medical source statement was authored in December 2014. Yet, the other subsequent treatment notes on the record also contradict the medical source statement. *See* treatment notes from Dr. Daoud: AR 362-63 (6/18/13, follow-up appointment, claimant states she is doing "well" and has "no active complaints," stable weight, no anxiety/depression/ mania/delusion/hallucinations, no cognitive dysfunction, no apparent distress, appropriate

psych); AR 552-53 (9/26/13, routine follow-up, weight gain, no apparent distress, normal bowel sounds, no tenderness, no nausea/vomiting, normal neuro examination, appropriate psych); and AR 545-47 (10/10/13, despite low potassium, claimant has appropriate psych, no depression/anxiety/agitation, no apparent distress, normal bowel sounds, no tenderness, no nausea, no vomiting, no abdominal pain, no diarrhea). *See also* AR 529-31 (9/23/13, Dr. Scott's report opining on claimant's mental limitations which are inconsistent with those reflected in Dr. Kettman's opinion); AR 522 (9/5/13, clinic note from Mayo Clinic authored by J.P. Campana, MBBS, claimant appeared in no acute distress, muscle strength/mass preserved); and AR 601-02 (12/17/14, clinic note from the Mayo Clinic authored by a MBChB reads: physical examination (skin/heart/lungs/abdomen/mental/neuro) were all "examined and normal", the general examination "looks healthy" and the physical examination of joints "examined and normal. No back tenderness", and also "advised [claimant] to avoid heavy lifting" but advised her to "continue exercising and stay active"). Other evidence on the record inconsistent with Dr. Kettman's opinion includes: AR 334-35 (1/1/13, Dr. Mallavarapu's clinic note reflects that despite claimant feeling some abdominal discomfort, she appeared in no acute distress, normal affect, alert and orientated, normal bowel sounds, normal range of motion).

The Commissioner cites Dr. Jay Ginther's plan recommendation as evidence that Dr. Kettman's opinion—that claimant could never lift ten pounds—is inconsistent. I am less persuaded. Claimant expresses similar concern in her reply brief[5]. Recommending weight exercise several times a week does not correspond to a claimant being able to lift weights during employment. *See* AR 311 (11/27/12, Dr. Ginther's clinic note reads: "All patients

---

[5] In her reply brief, claimant also argues that the ALJ improperly relied on a psychologist's opinion that claimant had a "normal gait" to discredit Dr. Kettman's opinion. This is an unfair assessment. To the extent that it matters, there is substantial evidence in the record from various medical professionals that claimant had a normal gait. For example, *see* AR 522 ("gait: examined and normal"), AR 303 (normal range of motion).

should do weight bearing exercises most days of the weight."). Nevertheless, there is still substantial evidence on the record to support the ALJ's decision to give Dr. Kettman's opinion no probative value.

## C. RFC is not supported by substantial evidence

Claimant argues that Dr. Elliot and Dr. Griffith's opinions as non-examining state consultants given great weight by the ALJ, do not amount to substantial evidence under *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000). Thus the improper RFC does not support the ALJ's finding of not disabled. Essentially, claimant asks the Court to again re-weigh the evidence on the record. On the other hand, the Commissioner contends that the RFC is supported by the state agency experts and the ALJ's own independent review of the medical record.

As the Commissioner points out, an "ALJ need not tether the RFC assessment to any particular medical opinion, [i]nstead, the ALJ may rely upon a constellation of opinions, or even the medical records themselves." (Doc. 14, at 16) (citing *Hensley v. Colvin*, 829 F.3d 926 (8th Cir. 2016) and *Julin*, 826 F.3d at 1088).

Claimant cites *Nevland*, which the Commissioner fails to address. I find, however, that *Nevland* is distinguishable. In that case, the court found that despite "the numerous treatment notes discussed . . . not one of Nevland's doctors was asked to comment on his ability to function in the workplace," and that the ALJ relying on the opinions of non-examining, non-treating physicians reviewing the opinions of treating physicians to form RFC opinions, did not constitute "*medical* evidence about how Nevland's impairments affect his ability to function now." *Id.*, at 858 (emphasis in original). The Eighth Circuit Court of Appeals elaborated that "[i]n our opinion, the ALJ should have sought [opinions] from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual function capacity." *Id.* Although, no examining physician

opined on claimant's physical ability to function in the workplace, there was a consultative examination conducted by a licensed psychologist who opined on claimant's mental ability to function in the workplace. (AR 530). Furthermore, the state agency consultants' opinions were consistent with findings by examining physicians on the record, including but not limited to the consultants' findings on claimant's physical ability to function in the workplace.

Claimant also argues that the opinions authored by Dr. Elliot and Dr. Griffith, the state consultants, are "seriously flawed" for failing to consider claimant's issues of nausea, vomiting, back pain, and psychosomatic issues. Claimant further contends that both the ALJ and the Commissioner failed to grasp the big picture relating to the interconnectedness of claimant's symptoms. Claimant alleges that her nausea and vomiting contributed to her low potassium levels, which in turn contributed to her osteoporosis, which in turn contributed to her decrease in height, compression fractures, and pain. (Doc. 15, at 2). The Commissioner contends that the record shows that despite claimant's symptom-fluctuations, medical providers where able to adequately control her symptoms with medication adjustments. (Doc. 14, at 17-18). Claimant takes issue with some of the Commissioner's citations to the record. (Doc. 15, at 2-3). Despite, claimant's attempts to have the Court re-weigh the evidence, I find that substantial evidence exists to support the ALJ's reliance on the state consultants and, overall, to support her RFC assessment.

First, the record shows that in the fall of 2013 claimant had weight gain (AR 552) and her potassium was no longer low (AR 572, potassium "elevated"), and she followed a modified gastroparesis diet with reasonable success and no reported vomiting (AR 517). In February of 2014, claimant's potassium levels were stable. (AR 624). In December of 2014, her constipation improved with medication. (AR 666). If a claimant's symptoms are reasonably controllable by treatment and medication then they are not

disabling. *Mabry v. Colvin*, 815 F.3d 386, at 391-92 (8th Cir. 2016) (citing *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010)).

Dr. Elliott opined that claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand/sit/walk for 6 hours with normal breaks during an 8-hour workday, unlimited pulling/pushing, occasional climbing ropes/stairs, occasional balancing, occasional kneeling/crouching/crawling/stooping, and unlimited exposure to fumes/odors. (AR 80-81). For mental limitations, Dr. Elliott gave great weight to Dr. Scott's report. (AR 82-84). Overall, Dr. Elliott found that claimant's reports of her limitations were undercut by her described daily activities and third party reports. On reconsideration, Dr. Griffith considered the new evidence of claimant's worsening condition of severe diarrhea and constipation due to gastroparesis. Dr. Griffith cited treatment notes (from 9/27/13 and 10/7/13) as well as Dr. Scott's report. Dr. Griffith affirmed the initial review by Dr. Elliott. (AR 100).

This is supported by substantial evidence on the record. First, the mental limitations, opined by both state consultants and Dr. Scott and Dr. Christiansen, are supported by substantial evidence on the record. *See Section VII.B.* above. The physical RFC assessment, which incorporated most of the state consultants' opinions, is supported by substantial evidence on the record. The physical RFC includes:

> Light work with the following physical and mental impairments: lift and carry 20 pounds occasionally; lift and carry 10 pounds frequently; stand or walk 6 hours out of an 8-hour workday; sit 6 hours out of an 8-hour workday; occasionally climb, balance, stoop, kneel, crouch, or crawl; only occasional exposure to extreme heat or cold; no exposure to hazardous conditions such as walking around heights or moving machinery; and cannot climb ropes, ladders or scaffolds.

This is supported by findings of normal physical examinations, normal gait, normal muscle mass, and Dr. Scott's examination. (AR 83, 284, 303, 334-35, 362-63, 522, 529-31, 552-53, 601-02, and 668). Despite whether or not I would have assessed the

evidence in the same manner as the ALJ, she did not err in her RFC assessment as substantial evidence exists to support the assessment.

## VIII. CONCLUSION

For the reasons set forth herein, I respectfully recommend the District Court **affirm** the Commissioner's determination that claimant was not disabled, and enter judgment against claimant and in favor of the Commissioner.

Parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CIV. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 25th day of May, 2017.

_____

C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa